**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------×
AKOBI SCHUSTER,

                *Plaintiff,*                    **18 CV 1826**

      *v.*

                                           **COMPLAINT**

CHARTER COMMUNICATIONS, INC.,

                *Defendant.*

-------------------------------------------------------------------------×

       Plaintiff Akobi Schuster, by his counsel, The Harman Firm, LLP, alleges for his Complaint against Defendant Charter Communications, Inc. ("Charter"), as follows:

## PRELIMINARY STATEMENT

       1.     Mr. Schuster seeks damages and costs against Charter for discriminating against him based on his disability by subjecting him to a hostile work environment, failing to provide him with a reasonable accommodation, and terminating his employment, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, and the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code §§ 8-101 *et seq.*

       2.     Mr. Schuster also seeks damages and costs against Charter for unlawfully interfering with his exercise of his rights under the ADA and NYCHRL.

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

       3.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims arising under the ADA.

       4.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's NYCHRL claims, as these claims are so related to the claims within such original jurisdiction that they form part of the same case or controversy.

5.      Pursuant to 28 U.S.C. § 1332, this Court has diversity jurisdiction over Plaintiff's claims, as the matter in controversy exceeds $75,000 and is between citizens of different states:

      a.  Mr. Schuster is a citizen of the State of New York, as he is domiciled in the State of New York.

      b.  Upon information and belief, Charter is a citizen of the State of Delaware, as it is a corporation organized under the laws of the State of Delaware, and a citizen of the State of Connecticut, as its headquarters are located in the State of Connecticut.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

7.      All conditions precedent to maintaining this action have been fulfilled.  A charge of discrimination was filed with the Equal Employment Opportunity Commission (EEOC).  The EEOC issued a Right-to-Sue letter dated November 30, 2017, relating to the discriminatory acts described in this Complaint.  This action was properly instituted within 90 days of the issuance of the Right-to-Sue letter.

## TRIAL BY JURY

8.      Plaintiff respectfully requests a trial before a jury.

## PARTIES

9.      Mr. Schuster, at all times relevant hereto, was and is a resident of New York County in the State of New York.

10.      Upon information and belief, at all times relevant hereto, Charter was and is a corporation organized under the laws of the State of Delaware with its headquarters located at

400 Atlantic Street, Stamford, Connecticut 06901 in Fairfield County and a location at 401 219th Street, New York, New York 10034 in New York County.

## STATEMENT OF FACTS

11.    On or about February 15, 2016, Mr. Schuster began working at Charter as a Cable Technician.

12.    Mr. Schuster was based out of Charter's 401 West 219th Street headquarters in Manhattan, but his work consisted primarily of performing cable and Internet service repairs and installations at Charter's clients' residences.

13.    Mr. Schuster's job performance at Charter was, by all accounts, satisfactory; he received positive feedback from his supervisors and never received any sort of discipline from Charter.

14.    On December 6, 2016, Mr. Schuster was injured in a workplace accident.

15.    On the morning of December 6, 2016, Mr. Schuster reported to a Charter customer's Manhattan apartment for a scheduled 8:00 a.m. service call to install a DVR, cable router, and cable box at the customer's residence.

16.    Mr. Schuster installed the DVR and cable router without issue.

17.    When Mr. Schuster proceeded to install the cable box, however, the cable box malfunctioned immediately after Mr. Schuster plugged it into an electrical outlet, emitting a loud noise and an immense amount of smoke and spewing a liquid into Mr. Schuster's right eye.

18.    Mr. Schuster immediately unplugged the faulty cable box, wrapped it in plastic bags, and removed it to his work truck.

19.    Mr. Schuster then called dispatch, told the dispatcher what had occurred, and completed the job, replacing the faulty cable box with a different model.

20.     After leaving the customer's residence, Mr. Schuster called his supervisor, Amar McLean.

21.     Mr. Schuster informed Mr. McLean of the accident and told him that he was experiencing serious head and eye pain, needed to go to the hospital, and would not be able to continue working that day.

22.     Shortly after Mr. Schuster and Mr. McLean ended their call, Fred Jack, another supervisor at Charter, called Mr. Schuster and asked him what had happened.

23.     Mr. Schuster described the accident to Mr. Jack and told him that he was returning to Charter's 219th Street headquarters, after which he needed to go to the hospital.

24.     Mr. Jack told Mr. Schuster that Mr. Schuster could drive back to headquarters but did not otherwise respond to Mr. Schuster's report.

25.     When Mr. Schuster arrived at Charter's headquarters, Mr. Jack was not in his office, so Mr. Schuster told a Charter foreman, Ray Rodriguez, about the accident and that he needed to go to the hospital.

26.     Mr. Rodriguez urged Mr. Schuster to go to the emergency room and gave him an incident form to fill out concerning the accident.

27.     Mr. Schuster walked to the Allen Hospital emergency room approximately one block away, where he was seen by an emergency room doctor.

28.     Mr. Schuster was diagnosed with chemical conjunctivitis—a serious condition caused by a toxic substance coming in contact with the eye and characterized by severe pain, decreased vision, redness, and significant swelling—and was prescribed Vigamox, an antibiotic, to treat his condition.

29.     Mr. Schuster's doctor gave Mr. Schuster clearance to return to work three days later, on December 9, 2016, and discharged him from the hospital that afternoon around 4:00 p.m.

30.     Mr. Schuster walked back to Charter's headquarters and attempted to find Mr. Jack, who was still not there.

31.     Mr. Schuster told three Charter foremen (David Acevedo, Damon Young, and an individual known to Mr. Schuster only as "Keith") about the accident and showed them the doctor's note.

32.     Mr. Acevedo, Mr. Young, and Keith then told Mr. Schuster, without explanation, that he needed to take a drug test.

33.     Mr. Acevedo scheduled Mr. Schuster's drug test and called a livery service to take him to a facility at John F. Kennedy Airport.

34.     Mr. Schuster took the drug test at approximately 9:43 p.m., the results of which came back negative.

35.     The livery service returned Mr. Schuster to Charter's headquarters, where he left the incident report with Charter and clocked out after 11:00 p.m.

36.     On December 9, 2016, Mr. Schuster returned to work, clocked in as usual around 7:30 a.m., and went out into the field for work.

37.     After approximately 30 minutes, around 8:00 a.m., Mr. Jack called Mr. Schuster and stated in an angry and hostile tone that Mr. Schuster "wasn't going to be given work" and needed to return to base and give him the cable box that had malfunctioned.

38.     Mr. Schuster returned to base and gave Mr. Jack the cable box, as instructed, and told Mr. Jack that he needed to rewrite the incident report because he had left out some important details.

39.     Mr. Jack did not give Mr. Schuster the original incident report for nearly an hour.

40.     When Mr. Jack finally gave him the incident report, Mr. Schuster immediately went to the break room to rewrite it.

41.     While Mr. Schuster was attempting to complete the incident report, Mr. Jack came into the break room three times in five minutes and interrupted him, demanding that Mr. Schuster "hurry up."

42.     Mr. Jack stood over Mr. Schuster in a threatening manner and refused to move.

43.     Mr. Schuster repeatedly asked Mr. Jack to step back, as Mr. Jack was making him uncomfortable, but Mr. Jack responded that he "didn't have to" and aggressively asked, "Do you know who I am?"

44.     Over ten technicians, two foremen, and a union representative were in the break room at the time and witnessed the incident.

45.     One of the foremen told Mr. Jack that he needed to leave the break room.

46.     Mr. Jack did so, but returned with a Charter manager, Roy Jackson, who informed Mr. Schuster that Charter needed the incident report.

47.     Mr. Schuster told Mr. Jackson that he was trying to finish the report, but Mr. Jack was not allowing him to do so.

48.     Mr. Jackson told Mr. Schuster to bring the incident report to Mr. Jack when he was finished.

49.     After he finished the report, Mr. Schuster went to Mr. Jack's office, as Mr. Jackson had instructed him to do, but Mr. Jack was not in his office.

50.     Mr. Schuster looked for and waited for Mr. Jack but was unable to find him.

51.     Finally, Keith found Mr. Schuster and told him that he had been instructed to collect the incident report.

52.     Approximately 30 minutes after Keith collected the incident report from Mr. Schuster, Mr. Jack approached Mr. Schuster and told him that he "couldn't begin working" because the doctor's note did not explicitly say that Mr. Schuster "was able to return to work without restriction."

53.     Mr. Schuster obtained the requested note and returned to work on December 10, 2016, with a note from his physician stating that he was cleared to return to full duty without restriction.

54.     Mr. Schuster gave the requested note to Mr. Jack and asked him if he knew why the cable box had malfunctioned on December 6, 2016.

55.     Mr. Jack said he did not know why the cable box had malfunctioned, and Mr. Schuster clocked in and returned to work.

56.     On December 13, 2016, Mr. Schuster had a meeting with Alexandria Dresser (Charter Communication Senior Manager of Health and Safety), Michael Comer (Charter Technical Operations Manager), Justin Minniti (Charter Director of Technical Operations), Murray Stevenson (Charter Safety Officer), and Richard Shabman (Union Representative).

57.     Ms. Dresser asked Mr. Schuster about the December 6, 2016 accident.

58.     Mr. Schuster described the accident and asked Ms. Dresser why the cable box had malfunctioned.

59.     Like Mr. Jack, Ms. Dresser told Mr. Schuster that she did not know.

60.     Mr. Schuster told Ms. Dresser that other technicians, after learning about the accident, had alerted Mr. Schuster to the fact that the model of cable box in question had a history of malfunctions.

61.     Because of this, Mr. Schuster stated, he was concerned that safety issues would occur again.

62.     Mr. Schuster told Ms. Dresser that he did not feel that he could perform any service calls involving the same model cable box without knowing whether he would be placing himself or other customers at risk, as doing so could create serious safety problems.

63.     Ms. Dresser told Mr. Schuster that the cable box was in transit to a Charter location in upstate New York for testing and that she would "disclose what happened [with the cable box] as soon as [she] found out."

64.     Ms. Dresser then assured Mr. Schuster that he "would be told why the cable box malfunctioned" and quickly terminated the meeting.

65.     Throughout the meeting, Mr. Schuster had continued to experience head and eye pain.

66.     Accordingly, after the meeting, Mr. Schuster asked Mr. McLean if he could ride out with another technician for that day due to his ongoing symptoms, which impaired his ability to drive.

67.     Mr. McLean agreed and promptly paired Mr. Schuster with another technician.

68.     Before Mr. Schuster could leave the parking lot with the technician, however, Mr. Comer stopped Mr. Schuster, informed him that Charter "did not have light duty," and told him that he "had to go on workers compensation."

69.     Mr. Schuster was shocked by this, as he had never requested "light duty" and, moreover, he had personally witnessed more than one technician who had been injured on the job ride out with another driver before driving alone.

70.     When Mr. Schuster raised this with Mr. Comer, however, Mr. Comer only reiterated that Mr. Schuster "had to leave and apply for workers compensation."

71.     Mr. Schuster complied with Mr. Comer's directive, applied for workers compensation, and made an appointment with a workers compensation doctor for January 12, 2017.

72.     Mr. Schuster was out on workers compensation from December 13, 2017, through January 17, 2017.

73.     While he was out, Mr. Schuster repeatedly contacted Charter, attempting to find out whether Charter had any information about why the cable box had malfunctioned.

74.     Each time, Mr. Schuster was told only that Charter "didn't know why the box malfunctioned."

75.     On or about December 19, 2016, Mr. Schuster filed a workplace hazard complaint against Charter with OSHA in order to find out why the cable box had malfunctioned, as he had never received a response from Charter.

76.     On or about the following day, December 20, 2016, Kay Gee (OSHA Area Director) informed Charter of Mr. Schuster's complaint via letter, in which she requested that Ms. Dresser investigate the matter and provide supporting documents showing why the cable box had malfunctioned.

77.     On or about January 9, 2017, Ms. Dresser responded to Ms. Gee's letter.

78.     Referencing an email sent to her by Larry Gonzalez, a representative from the cable box's manufacturer, Ms. Dresser claimed that the cable box had been sent to the manufacturer, who asserted that the circuit board shorted out, causing the fuse to blow.

79.     Mr. Schuster was not made aware of Ms. Dresser's response letter until May 2017.

80.     On or about January 17, 2017, Mr. Schuster returned to work from workers compensation with a medical clearance note.

81.     After Mr. Schuster returned from leave, Charter began retaliating against him for his complaints.

82.     Charter still maintained that they did not know why the cable box malfunctioned.

83.     Mr. Schuster informed his supervisor and Charter management that he could perform all of his work duties, but he still did not feel it was safe to work with the same model of cable box without knowing why it had malfunctioned.

84.     Charter dispatch management, however, still sent Mr. Schuster to service calls that included the same model of cable box that had malfunctioned, despite knowing about the serious safety issues and Mr. Schuster's request.

85.     This made Mr. Schuster extremely anxious and uncomfortable, as he felt very unsafe working with the model of cable box without knowing the cause of the accident.

86.     Each time Mr. Schuster completed a digital technical feedback form after a job, he cited the attempted completion of such service calls as a liability, noting that he would be placing the customer and himself at risk because he still did not know why the cable box had malfunctioned.

87.     When Charter instructed him to install the faulty model of cable box at a customer's residence, Mr. Schuster would give the customer his supervisor's business card, inform them that he could not complete the service call, and tell them that his supervisor would be giving them a call.

88.     After leaving the customer's home, Mr. Schuster would then call his supervisor, inform him of the job he had been given, and ask him if he knew why the cable box malfunctioned.

89.     Each time, Mr. Schuster's supervisors told him that they did not know why the box malfunctioned and would arrange for Charter dispatch to send Mr. Schuster to another job.

90.     On or about February 16, 2017, Mr. Schuster arrived at a customer's home for a service call work order.

91.     When the customer took Mr. Schuster into her bedroom to work on the problem with her television service, he discovered that she had the same model of cable box that had malfunctioned.

92.     Mr. Schuster still felt highly uncomfortable working with the cable box, but attempted to do so.

93.     Mr. Schuster went to the roof to check the customer's connection to Charter's tap and found that customer connection was rusted and connected to a splitter, which was degrading the signal.

94.     Mr. Schuster began to make the necessary changes to repair the connection, but suddenly began to experience serious and distressing medical symptoms, including chest tightness and labored breathing.

95.     Mr. Schuster reported back to the customer's apartment and concluded the work order, telling the customer that she would need a new modem.

96.     After leaving the customer's residence, Mr. Schuster's condition continued to grow worse, and he called 911 from his work truck.

97.     When the EMTs arrived, they took Mr. Schuster's blood pressure, which was 220/140, and transported him to the emergency room at St. Luke's Hospital.

98.     The EMT technician showed concern and informed Mr. Schuster that if his blood pressure kept rising, he was at risk of having a stroke or heart attack.

99.     After Mr. Schuster's blood pressure dropped to a safe level, he was seen by an emergency room psychiatrist at St. Luke's.

100.    Mr. Schuster told the emergency room psychiatrist what had occurred and described his trepidation about working with the faulty model of cable box.

101.    After evaluating Mr. Schuster's symptoms, the psychiatrist told Mr. Schuster that he had experienced a panic attack while attempting to troubleshoot the cable box without knowing why it malfunctioned and that he had experienced similar symptoms of panic and anxiety on previous jobs where he had encountered that model of cable box.

102.    Mr. McLean sent a Charter technician to pick Mr. Schuster up from the emergency room.

103.    When Mr. Schuster returned to work, he informed Mr. McLean of what had occurred and of the emergency room psychiatrist's assessment.

104.    Yet, despite knowing Mr. Schuster had had a severe panic attack while working on the cable box, Charter continued to send him on jobs with the same model of cable box without telling him why the cable box had malfunctioned.

105.    On March 3, 2017, after Mr. Schuster clocked out at the end of his workday, Mr. McLean informed him that he could not return to work and had to go on workers compensation, without offering any sort of explanation.

106.    When Mr. Schuster told Mr. McLean that he could not collect workers compensation insurance without a reason, Mr. McLean told Mr. Schuster that he "didn't know the reason."

107.    Mr. McLean then advised Mr. Schuster to call Joanne Teijmul, a Charter Workers Compensation Analyst, telling Mr. Schuster that Ms. Teijmul had stated that Mr. Schuster had to go on workers compensation.

108.    Mr. Schuster called Ms. Teijmul after the meeting with Mr. McLean but did not receive a response.

109.    On or about March 6, 2017, Mr. Schuster again called Ms. Teijmul.

110.    When Ms. Teijmul answered the phone, she was confused about why Mr. Schuster had called her.

111.    Mr. Schuster informed her that Mr. McLean had told him that she had stated that Mr. Schuster "had to go on workers compensation."

112.    Ms. Teijmul then told Mr. Schuster that Charter had "made a mess of things" and that she would call Charter, then call Mr. Schuster back.

113.    When Ms. Teijmul called Mr. Schuster back, she was unable to give him a definitive reason as to why he had to go on workers compensation.

114.    At no point did Ms. Teijmul or anyone else from Charter tell Mr. Schuster that he was being placed on a medical leave of absence, nor did Charter ever give Mr. Schuster the documents required for him to go on a leave of absence.

115.    Around this time, in and around March 2017, Ms. Teijmul told Mr. Schuster that he could not remain employed with Charter if he could not work with the model of cable box that had malfunctioned, even though she was fully aware of Mr. Schuster's panic attack and why it had occurred.

116.    On or about March 8, 2017, Mr. Schuster filed a retaliation claim with OSHA against Charter, regarding Charter's prohibiting him from returning to work in retaliation for Mr. Schuster's complaint, including his December 19, 2016 workplace hazard OSHA claim.

117.    On or about March 17, 2017, Mr. Schuster received a letter from Ms. Gee, informing him that his December 19, 2016 work hazard complaint had been dismissed.

118.    On or about April 10, 2017, Iesha A. Henry, Charter's Director of Human Resources, sent Mr. Schuster a letter, stating that he had been placed on a "leave of absence," in contradiction to Charter's previous representations that Mr. Schuster "had to go on workers compensation."

119.    This was the first letter or document that Mr. Schuster had received from Charter since being told that he could not return to work on March 3, 2017.

120.    Ms. Henry claimed that Mr. Schuster's leave of absence was not approved because Mr. Schuster had not provided Charter with a medical clearance note from his doctor.

121.    Ms. Henry never explained to Mr. Schuster why he needed a medical clearance note from his doctor.

122.    On or about June 8, 2017, Concetta Ciliberti, Charter's Vice President of Human Resources, sent Mr. Schuster another letter, reiterating what Ms. Henry had said in her previous letter.

123.    Ms. Ciliberti's letter claimed that on March 1, 2017, Mr. Schuster had informed a Charter dispatcher that he could not perform his job because he was feeling the onset of a panic attack and claimed that that was the reason Mr. Schuster was prohibited from returning to work on March 3, 2017.

124.    No one at Charter had ever mentioned anything about a March 1, 2017 incident to Mr. Schuster prior to this letter.

125.    Ms. Ciliberti also claimed that Mr. Schuster had "pursued a workers compensation claim on his own" and stated that Mr. Schuster could return to work "as long as [he] crossed the picket line."

126.    On or about July 7, 2017, Kenneth Margolis, an attorney representing Charter, responded to the OSHA retaliation claim Mr. Schuster had filed on March 8, 2017.

127.    Mr. Margolis gave a completely different reason for why the cable box had malfunctioned than Ms. Dresser's stated reason in her January 9, 2017 letter: Mr. Margolis claimed the box's manufacturer had found paraffin candle wax on the box's mainboard and believed that a candle was placed on top of the cable box, causing wax to drip through the vent onto the mainboard, causing the malfunction.

128.    Mr. Margolis also claimed that Mr. Schuster was never advised to go on workers compensation, but that he had been placed on a leave of absence.

129.    On or about August 28, 2017, Mr. Margolis now claimed that Charter had advised Mr. Schuster to go on workers compensation and, "as an accommodation," placed him on a medical leave of absence because he did not provide a doctor's note to return to work.

130.    On or about September 18, 2017, Mr. Schuster received a letter from John Murphy, OSHA Regional Supervisory Investigator, stating that he had received a copy of Mr. Schuster's "amended" retaliation complaint.

131.    However, Mr. Schuster never submitted an amended retaliation complaint.

132.    To date, Charter has not provided any supporting documents for why the cable box malfunctioned or otherwise meaningfully addressed Mr. Schuster's complaints.

133.    Because of Charter's discriminatory response to Mr. Schuster's injuries, he has been unpaid since March 2017.

134.    Charter refused to accommodate Mr. Schuster's medical condition, both with respect to his physical symptoms as well as the mental symptoms that developed.

135.    Instead, Charter harassed Mr. Schuster and retaliated against him for complaining of Charter's unwillingness to accommodate his disability and its unwillingness to provide him with a safe working environment.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
### Hostile Work Environment in Violation of the ADA

136.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 135 with the same force as though separately alleged herein.

137.    The ADA prohibits an employer from discriminating against a qualified individual with a disability in terms, conditions, and privileges of employment.

138.    Defendant violated the ADA when it subjected Plaintiff to a hostile work environment based on his disability.

139.     As a direct and proximate consequence of Defendant's disability discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

140.     Defendant's discriminatory conduct was willful and in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

**SECOND CAUSE OF ACTION**
**Failure to Provide a Reasonable Accommodation in Violation of the ADA**

141.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 140 with the same force as though separately alleged herein.

142.     The ADA requires an employer to engage in an interactive process to identify reasonable accommodations for an otherwise qualified employee with a disability.

143.     Defendant violated the ADA when it refused to grant Plaintiff's request for a reasonable accommodation for his disability and failed to engage in the mandatory interactive process to provide a reasonable accommodation for Plaintiff's disability.

144.     As a direct and proximate consequence of Defendant's failure to accommodate his disability, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

145.     Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### Wrongful Termination in Violation of the ADA

146.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 145 with the same force as though separately alleged herein.

147.     The ADA prohibits an employer from discriminating against an employee in terms, conditions, or privileges of employment on the basis of disability.

148.     Defendant discriminated against Plaintiff on the basis of his disability by effectively terminating his employment based on his disability.

149.     As such, Defendant has violated the ADA.

150.     As a direct and proximate consequence of Defendant's disability discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

151.     Defendant's discriminatory treatment of Plaintiff was willful and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## FOURTH CAUSE OF ACTION
### Interference in Violation of the ADA

152.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 151 with the same force as though separately alleged herein.

153.     The ADA provides that an employer may not "coerce, intimidate, threaten, or interfere with" an employee's exercise of their rights under the ADA or on account of the employee's having exercised their rights under the ADA.

154.     Plaintiff exercised his protected rights under the ADA when he requested a reasonable accommodation for his disability.

155.    Defendant violated the ADA when it interfered with Plaintiff's exercise of his ADA-protected rights by subjecting him to further discrimination and harassment and terminating his employment because of his requests for reasonable accommodations.

156.    As a direct and proximate consequence of Defendant's ADA interference, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

## FIFTH CAUSE OF ACTION
### Hostile Work Environment in Violation of the NYCHRL

157.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

158.    The NYCHRL prohibits an employer from discriminating against an employee in compensation or in terms, conditions, and privileges of employment on the basis of disability.

159.    Defendant violated the NYCHRL when it subjected Plaintiff to a hostile work environment based on his disability.

160.    As a direct and proximate consequence of Defendant's disability discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

161.    Defendant's discriminatory treatment of Plaintiff involved a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## SIXTH CAUSE OF ACTION
### Failure to Provide a Reasonable Accommodation in Violation of the NYCHRL

162.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 161 with the same force as though separately alleged herein.

163.     The NYCHRL requires an employer to make a reasonable accommodation to enable an employee with a disability to satisfy the essential requisites of a job, provided that the disability is known or should have been known to the employer.

164.     At all relevant times, Plaintiff was an individual with a disability within the meaning of the NYCHRL.

165.     Defendant was fully aware of Plaintiff's disability, as Plaintiff notified Defendant of his disability and requested related reasonable accommodations.

166.     Defendant refused to grant Plaintiff's requests for a reasonable accommodation for his disability and failed to engage in the mandatory interactive process to provide a reasonable accommodation for Plaintiff's disability.

167.     As such, Defendant has violated the NYCHRL.

168.     As a direct and proximate consequence of Defendant's failure to accommodate his disability, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

169.     Defendant's discriminatory treatment of Plaintiff involved a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

### SEVENTH CAUSE OF ACTION
### Wrongful Termination in Violation of the NYCHRL

170.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 169 with the same force as though separately alleged herein.

171.     The NYCHRL prohibits an employer from discriminating against an employee in compensation or in terms, conditions, and privileges of employment on the basis of his disability.

172.     Defendant violated the NYCHRL when it effectively terminated Plaintiff's employment based on his disability.

173.     As a direct and proximate consequence of Defendant's disability discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

174.     Defendant's discriminatory treatment of Plaintiff involved a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

**EIGHTH CAUSE OF ACTION**
**Interference in Violation of the NYCHRL**

175.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 174 with the same force as though separately alleged herein.

176.     The NYCHRL provides that an employer may not coerce, intimidate, threaten, or interfere with an employee's exercise or enjoyment of their rights under the NYCHRL.

177.     Plaintiff exercised his protected rights under the NYCHRL when he requested a reasonable accommodation for his disability.

178.     Defendant interfered with Plaintiff's exercise of his NYCHRL-protected rights by terminating his employment because of his request for a reasonable accommodation.

179.     As such, Defendant has violated the NYCHRL.

180.     As a direct and proximate consequence of Defendant's NYCHRL interference, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  For the first cause of action, damages to be determined at trial;

B.  For the second cause of action, damages to be determined at trial;

C.  For the third cause of action, damages to be determined at trial;

D.  For the fourth cause of action, damages to be determined at trial;

E.  For the fifth cause of action, damages to be determined at trial;

F.  For the sixth cause of action, damages to be determined at trial;

G.  For the seventh cause of action, damages to be determined at trial;

H.  For the eighth cause of action, damages to be determined at trial; and

I.  For such other and further relief as the Court deems just and proper.


Dated: New York, New York
February 28, 2018

By:    s/ Walker G. Harman, Jr.
Walker G. Harman, Jr. [WH-8044]
Edgar M. Rivera [ER-1378]
THE HARMAN FIRM, LLP
234 Fifth Avenue, 4th Floor, #409
New York, NY 10001
(212) 425-2600
wharman@theharmanfirm.com
erivera@theharmanfirm.com

*Attorneys for Plaintiff*